IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA L. CIRINO, | ) | CASE NO.  1:23-CV-01379-PAG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Plaintiff, Sandra Cirino ("Plaintiff" or "Cirino"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

In July 2021, Cirino filed an application for POD, DIB, and SSI, alleging a disability onset date of October 18, 2019, and claiming she was disabled due to hemicrania continua, triple negative breast cancer

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

with long-term effects, stage 1, Chiari malformation, asthma, COPD, depression/myalgia, anti phospholipid syndrome/lupus anticoagulant, chronic pain, granulocyte colony stimulating factor, neuropathy, and memory loss.   (Transcript ("Tr.") 26, 70.)  The applications were denied initially and upon reconsideration, and Cirino requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 26.)

On September 1, 2022, an ALJ held a hearing, during which Cirino, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On October 21, 2022, the ALJ issued a written decision finding Cirino was not disabled.  (*Id.* at 26-34.)  The ALJ's decision became final on May 18, 2023, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On July 18, 2023, Cirino filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9-10.)  Cirino asserts the following assignments of error:

(1)    The ALJ committed harmful error when he failed to support his findings at Step Three of the Sequential Evaluation.

(2)    The ALJ erred when he failed to properly evaluate Plaintiff's headaches at Step Three of the Sequential Evaluation.

(3)    The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

(Doc. No. 7.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Cirino was born in August 1970 and was 52 years-old at the time of her administrative hearing (Tr. 26, 33), making her a "person closely approaching advanced age" under Social Security regulations.  *See*

20 C.F.R. §§ 404.1563(d), 416.963(d).  She has at least a high school education.  (Tr. 33.)  She has past relevant work as an assembly manager.  (*Id.*)

## B.    Relevant Medical Evidence[2]

On September 23, 2019, Cirino underwent a lumpectomy and biopsy, which revealed tiple negative breast cancer.  (Tr. 504.)  Cirino started chemotherapy on October 10, 2019.  (*Id.*)

A PET/CT scan taken on October 18, 2019 revealed no metastatic disease.  (*Id.*)

From November 1 to 6, 2019, Cirino was hospitalized for asthma exacerbation.  (*Id.* at 1653.) While there, she received steroids, oxygen, and antibiotics.  (*Id.*)  Treatment providers noted Cirino was in stable condition at discharge.  (*Id.*)

Cirino completed chemotherapy on February 20, 2020.  (*Id.* at 504.)

On March 3, 2020, Cirino saw primary care physician Mark McLoney, M.D., for follow up and medication management.  (*Id.* at 340-41.)  Cirino reported continued neuropathy, worsening hand pain, and some difficulty with fine motor skills.  (*Id.* at 341.)  Cirino's diagnoses included chronic daily headache and hemicrania continua (Chiari I malformation), for which she saw pain management.  (*Id.* at 341-42.)

Cirino completed radiation therapy on April 15, 2020.  (*Id.* at 504.)

On May 6, 2020, Cirino reported increased pain in her arms and numbness in her hands.  (*Id.*)

On August 11, 2020, Cirino saw Erin Naso, APRN, CNP, for follow up.  (*Id.* at 1531.)  Cirino complained of "new 'tremors'" along with periods of "shacking," fatigue, and slurring words that would resolve.  (*Id.*)  Cirino also endorsed worsening headaches.  (*Id.*)  Cirino reported continued chronic pain. (*Id.*)  She also had difficulty swallowing and felt like she had a lump in her throat.  (*Id.*)  Naso noted that

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Cirino only challenges the ALJ's findings regarding her physical impairments, the Court further limits its discussion of the evidence to Cirino's physical impairments.

a May 15, 2020 bone scan to evaluate bone pain was negative. (*Id.* at 1532.) Naso found tenderness of the lower extremities on examination, but normal ambulation, full orientation, and the ability to answer questions appropriately. (*Id.* at 1533.) Naso directed Cirino to go to the ER if the "shacking" and slurred speech returned. (*Id.*) Naso ordered an MRI and bloodwork. (*Id.*)

On October 6, 2020, Cirino saw Shailey Desai, M.D., for evaluation of her joint pain. (*Id.* at 1513, 1517.) Cirino reported pain since undergoing chemotherapy, worst in her low back and hips down to her feet and less severe in her shoulders and arms. (*Id.* at 1513.) Activity helped the pain a little. (*Id.*) Cirino told Dr. Desai that her morning stiffness could last all day. (*Id.*) Taking soma and oxycodone helped. (*Id.*) On examination, Dr. Desai found normal gait, the ability to fully close fists and curl fingers bilaterally, and tenderness to palpation of the bilateral ankles. (*Id.* at 1515.) Dr. Desai further found examination findings consistent with fibromyalgia. (*Id.*) Dr. Desai diagnosed Cirino with fibromyalgia and recommended aerobic exercise. (*Id.* at 1517.) Dr. Desai noted Cirino had not tolerated Cymbalta or Gabapentin in the past. (*Id.*)

On November 12, 2020, a computer tomographic angiography study of Cirino's brain showed no evidence of infarction, intracranial hemorrhage, or mass lesions, although it did show "mild inferior descent of the cerebellar tonsils through the foremen magnum." (*Id.* at 1543.)

On January 27, 2021, Cirino saw Jeff Tarcy, PA-C, for a neurological consultation concerning her chronic daily headaches. (*Id.* at 551.) Cirino reported seeing multiple providers and trying multiple therapies for her headaches without relief. (*Id.*) Cirino described "constant suboccipital aching and stabbing pain" that was worse with looking at screens for 10-15 minutes and driving for a while. (*Id.*) Exertional activity sometimes worsened her pain. (*Id.* at 552.) Taking oxycodone and soma improved her headaches after 30 minutes. (*Id.*) Nothing helped the pain as well as oxycodone and soma. (*Id.*) Cirino also endorsed hip and leg pain, bilateral shoulder pain, intermittent involuntary movements of the bilateral

hands, depression, and cognitive issues.  (*Id.*)  On examination, Tarcy found Cirino in no distress with normal muscle tone and strength, normal reflexes, and normal gait.  (*Id.* at 554.)  Tarcy noted a recent brain MRI revealed "a mild cerebellar ectopia without significant compression or diminished CSF spaces" that looked "slightly better" or "at the very least does not look worse" than imaging in 2012.  (*Id.* at 555.) Tarcy recommended a spinal MRI, and pending the results, a possible consult to the headache clinic.  (*Id.*)

A spinal MRI taken on February 12, 2021 revealed retrolisthesis of C5 over C6, limited CSF space surrounding the cord but no compression, moderate right and mild left foraminal narrowing, mild lumbar degenerative change with lateral recess narrowing on the right at L3/4 and bilaterally at L4/5 and L5/S1, which may contribute to radiculopathy, normal cord volume and signal, and mild crowding at the foramen magnum.  (*Id.* at 517.)

On March 10, 2021, Cirino saw Dr. E. Baron for evaluation of her headaches.  (*Id.* at 1535.)  Dr. Baron opined that Cirino's headaches "overall fit best with hemicrania continua," but she had an adverse reaction to indomethacin and was now on coumadin.  (*Id.*)  Cirino's headaches could also fit with chronic migraines as a result of "MOH/rebound from daily opiates," although chronic migraines would not start as daily headaches.  (*Id.*)  Her presentation also fit with "NDPH given the abrupt onset and persistence since it began in 2005."  (*Id.*)  Dr. Baron opined that there was "also some b/l occipital neuralgia present."  (*Id.*) Dr. Baron intended to treat all of these possibilities.  (*Id.*)  In terms of acute headache treatment, he prescribed Nurtec and weaning off opiates.  (*Id.*)  In terms of preventative treatment, he prescribed Botox when approved.  (*Id.*)  Dr. Baron noted Cirino had 30 headaches per month lasting four or more hours and associated with photophobia, phonophobia, and nausea.  (*Id.*)  Dr. Baron opined that Cirino's disability was high.  (*Id.*)  Cirino had tried and failed a large number of medications, including analgesics, anti-anxiety, anti-convulsant, anti-depression/anti-psychotic, antiemetics, anti-migraine, blood pressure

medication, muscle relaxers, sleep aids, supplements, over the counter medications, and other medications.  (*Id.* at 1536-37.)

On March 11, 2021, Cirino saw Ruth Lagman, M.D., for follow up regarding her bilateral hip and knee pain.  (*Id.* at 504.)  Dr. Lagman noted Cirino's chronic hip and knee pain had worsened with her breast cancer treatment.  (*Id.* at 505.)  Dr. Lagman further noted an additional diagnosis of fibromyalgia.  (*Id.*)  Cirino reported her leg pain was severe that day and reported that her hands had been falling asleep.  (*Id.*)  Dr. Lagman noted Cirino's medication for her headaches was helping her headaches but not her muscle and joint pain.  (*Id.*)  On examination, Dr. Lagman found Cirino in no distress, but she appeared tired.  (*Id.* at 506.)  Dr. Lagman continued Cirino's medication and referred her to Spine Medicine.  (*Id.* at 507.)  Dr. Lagman opined that Cirino would "need a multimodality treatment plan for her chronic pain syndromes including exercise, meditation, distraction and complementary medicine."  (*Id.* at 508.)

On April 15, 2021, Cirino saw Francois Abi Fadel, M.D., by telephone for complaints of cough, wheezing, and shortness of breath. (*Id.* at 1646-47.)  Dr. Fadel noted Cirino was an active smoker.  (*Id.* at 1646.)  A pulmonary function test in August 2020 demonstrated "moderate airway obstructive lung disease with air trapping and significant response post bronchodilators."  (*Id.*)  Cirino's diagnoses included asthma-COPD overlap syndrome, shortness of breath, anti-phospholipid syndrome, and COPD exacerbation.  (*Id.* at 1646-47.)  Dr. Fadel prescribed a course of prednisone and doxycycline for Cirino's COPD exacerbation.  (*Id.* at 1647.)

On June 22, 2021, Cirino saw Todd Markowski, APRN-CNP, for pain management regarding her chronic pain secondary to hemicrania continua (Chiari I malformation).  (*Id.* at 315.)  Cirino reported being stable since her last visit.  (*Id.*)  She described her pain as sharp, dull, continuous, and aching, and denied weakness of her arms and legs.  (*Id.*)  Stress and light exacerbated her pain.  (*Id.*)  Oxycodone reduced her pain from an 8/10 to a 4/10 and improved her ability to perform her activities of daily living.

(*Id.*)  Cirino denied any adverse medication side effects.  (*Id.*)  Markowski noted he had not seen Cirino in 18 months because she was undergoing cancer treatment.  (*Id.*)  Cirino also endorsed other sources of pain, including her hips, legs, feet, neck, and lower back.  (*Id.*)  On examination, Markowski found Cirino in no distress with normal muscle strength, tenderness to palpation in the right frontal lobe, no swelling or erythema, and right eye ptosis.  (*Id.* at 318.)  Markowski reduced Cirino's Oxycodone and told her she would need to wean off Soma.  (*Id.* at 319.)

On August 24, 2021, Cirino saw Dr. Fadel for follow up.  (*Id.* at 1649.)  Cirino reported shortness of breath with exertion.  (*Id.*)  Dr. Fadel noted she was doing well, although she was still smoking.  (*Id.*)  Dr. Fadel further noted Cirino had not had any COPD exacerbations since her last visit and that she was still smoking five cigarettes a day.  (*Id.* at 1650.)

On September 1, 2021, Cirino completed an Adult Function Report.  (*Id.* at 235-44.)  Cirino reported she was unable to work because of severe bone pain from her hips to her toes, which made her unable to stand or sit for long periods of time, and because of hemicrania continua, which is a severe never-ending headache.  (*Id.* at 235.)  She has three to four episodes of intense headache pain a day.  (*Id.*)  Her headaches have caused her to lose her memory and she struggles with comprehension of everyday tasks.  (*Id.*)  In addition, she has neuropathy in her hands and arms, which causes numbness, tingling, and pain.  (*Id.*)  She also has breathing problems from asthma and COPD.  (*Id.*)  When she wakes up, she takes her pain medication.  (*Id.* at 236.)  Once it starts working, she takes a hot shower.  (*Id.*)  She needs to lay down for an hour or so after showering.  (*Id.*)  Depending on her pain level that day, she tries to do a few chores around the house.  (*Id.*)  Too much activity increases her pain.  (*Id.*)  She is usually on the couch or in bed in the afternoon.  (*Id.*)  She feeds her cats, but her daughter cleans the litterbox.  (*Id.*)  She tries to wear things that are easy to put on, including slip on shoes.  (*Id.*)  She needs occasional reminders to take her medicine because of her memory issues.  (*Id.* at 239.)  She tries to help her daughters with cooking a

7

few times a week.  (*Id.*)  She can fold laundry, dust, water plants, and pull weeds.  (*Id.*)  She can drive and go out alone.  (*Id.* at 240.)  She shops for groceries in stores for a half hour weekly.  (*Id.*)  She can pay bills, count change, handle a savings account, and use a checkbook/money order.  (*Id.*)  However, she forgets to write transactions down in the checkbook and doesn't remember to pay bills on time.  (*Id.*)  She watches TV and does puzzles, but she lacks concentration for both.  (*Id.* at 241.)  She also cannot sit long, and her vision is bad.  (*Id.*)  She visits with others in person and on the phone once or twice a week.  (*Id.*)  She needs help loading and unloading groceries and carrying them into the house.  (*Id.*)  She can walk for 500 feet before needing to rest for five minutes before walking again.  (*Id.* at 242.)  She can pay attention for 10-15 minutes.  (*Id.*)  She struggles with following written and spoken instructions.  (*Id.*)  She does not handle stress well, as it makes her headache "unbearable."  (*Id.* at 243.)  It took her several days to complete the form because reading is one of her headache triggers.  (*Id.* at 244.)

On December 23, 2021, Cirino saw APRN-CNP Markowski for pain management follow up.  (*Id.* at 1598.)  Cirino reported being stable since her last visit.  (*Id.*)  She described her pain as sharp, dull, continuous, and aching and denied weakness of her arms and legs.  (*Id.*)  Sitting, being on a computer, and stress exacerbated her pain.  (*Id.*)  Oxycodone reduced her pain from an 8.5/10 to a 4.5/10 and improved her ability to perform her activities of daily living.  (*Id.*)  Cirino denied any adverse medication side effects.  (*Id.*)  Cirino also endorsed continued arm and hand pain from chemo.  (*Id.*)  On examination, Markowski found Cirino in no distress with normal muscle strength, tenderness to palpation in the right frontal lobe, no swelling or erythema, and right eye ptosis.  (*Id.* at 1601.)  Markowski continued Cirino's medication.  (*Id.* at 1602.)

X-rays of the right wrist taken on February 7, 2022 revealed no acute osseous abnormality and mild osteoarthritis in the right hand and wrist.  (*Id.* at 1856-57.)

8

On February 18, 2022, Cirino saw Markowski for pain management follow up.  (*Id.* at 1881.) Cirino reported being stable since her last visit.  (*Id.*)  She described her pain as dull and aching and denied weakness of her arms and legs.  (*Id.*)  Looking at a computer and stress exacerbated her pain.  (*Id.*) Oxycodone reduced her pain from an 9/10 to a 5/10 and improved her ability to perform her activities of daily living.  (*Id.*)  Cirino denied any adverse medication side effects.  (*Id.*)  On examination, Markowski found Cirino in no distress with normal muscle strength, tenderness to palpation in the right frontal lobe, no swelling or erythema, and right eye ptosis.  (*Id.* at 1883-84.)  Markowski continued Cirino's medication.  (*Id.* at 1884-85.)

On March 2, 2022, Cirino saw Antonia Rampazzo, M.D., for complaints of right wrist pain.  (*Id.* at 1917-18.)  Cirino reported that on February 4, 2022, she had slipped on ice and fell onto her right wrist, and she was seen three days later in urgent care for persistent pain.  (*Id.* at 1918.)  Cirino underwent x-rays and was told to follow up for further management of her injury.  (*Id.*)  Cirino reported constant aching in her wrist and sharp pain with movement.  (*Id.*)  Cirino also endorsed worsening neuropathy in her hands since she fell.  (*Id.*)  On examination, Dr. Rampazzo found Cirino "very tender" at the level of the right distal radius and "slightly" tender at the scaphoid level.  (*Id.* at 1925.)  X-rays taken that day revealed a distal radius fracture.  (*Id.*)  Because of Cirino's tenderness, Dr. Rampazzo recommended a short cast for four weeks.  (*Id.*)

On March 31, 2022, Cirino saw Dr. Abramovich for follow up regarding her breast cancer.  (*Id.* at 1994.)  Cirino reported she was "struggling"; she continued to have fatigue since undergoing chemotherapy, as well as hip and knee pain and neuropathy in her fingers.  (*Id.*)  Cirino told Dr. Abramovich that pain management was not addressing her neuropathy.  (*Id.* at 1995.)  Dr. Abramovich told Cirino there wasn't much that could be done medically for her neuropathic pain.  (*Id.*)  Dr. Abramovich provided another pain management referral and told her to consider acupuncture.  (*Id.*)  On

9

examination, Dr. Abramovich found Cirino in no acute distress with normal motor and sensory function in the upper and lower extremities bilaterally and normal muscle strength. (*Id.* at 1997.)

On April 1, 2022, Dr. Abramovich partially completed a Physical Medical Source Statement. (*Id.* at 2652-53.) Dr. Abramovich listed Cirino's symptoms as fatigue, neuropathy in her hands and feet, and chronic pain. (*Id.* at 2652.) Dr. Abramovich also described Cirino's pain as chronic neuropathy pain. (*Id.*) Other than listing the frequency and length of contact he had with Cirino and Cirino's diagnoses, Dr. Abramovich left the rest of the form blank. (*Id.* at 2652-53.)

On May 11, 2022, Cirino saw Barbara Merriman, D.O., for an evaluation of her neuropathy. (*Id.* at 1971.) Cirino reported paresthesias in her entire hands and feet bilaterally, and her feet hurt so much that she was often tearful from the pain. (*Id.* at 1973.) Cirino also endorsed bone pain from her hips to her feet, severe short term memory problems, diminished taste and altered smell, vision changes, mood swings, and daily headaches. (*Id.* at 1973-74.) Cirino rated the pain from her headaches as ranging from a 4-8/10 and reported it was present all the time. (*Id.* at 1974.) Cirino rated her bone pain as a 7-8/10 and reported that it woke her up every two hours. (*Id.*) Her bone pain was also constant. (*Id.*) Nothing helped her bone pain and walking made it worse. (*Id.*) Cirino told Dr. Merriman she would accept brain fog as a side effect of narcotics because her pain was so severe. (*Id.*)

On examination, Dr. Merriman found "[a]ntalgic weakness globally," 4+/5 muscle strength, no focal weakness, decreased pinprick sensation in all right-sided dermatomes of the arm and leg, slightly decreased sensation to vibration at the right wrist, decreased sensation to vibration below the knee moving distally bilaterally, 100% incorrect proprioception in the right hallux, and a slow, antalgic, and symmetric gait, with abnormal Romberg and tandem. (*Id.* at 1974-75.) Dr. Merriman opined:

> Her exam today is classic for small and large fiber neuropathy. She has asymmetric pinprick reduced more significantly in the right arm and leg, and decreasing vibration gradient moving distally in both legs. Proprioception is

missed completely on the right with each hallux position, and is correctly answered with most positions on the left.  Romberg and tandem are abnormal.

I am deferring a peripheral neuropathy work-up at this time because her exam is so convincing that the work-up would not clarify much.  She has tried and failed Cymbalta, gabapentin, and Lyrica.  We tried to prescribe nortriptyline daily but this also fails due to severe drug drug [sic] interaction with Adderall.  I did recommend Biofreeze as a topical solution that may work.

The bone pain following Neulasta treatments is best treated with pain management.  She does take oxycodone at this time through pain management at MetroHealth and I encouraged her to switch over to Cleveland clinic since there [sic] services are quite limited.

I have also encouraged her to recontact her headache provider here at Cleveland clinic for her headaches which are constant and daily.  Her latest drug treatment was Nurtec however this never materialized due to insurance authorization problems.

(*Id.* at 1975.)

On May 18, 2022, Cirino saw Megan Kelly, APRN-CNP, for follow up regarding her right wrist pain.  (*Id.* at 1959-60.)  Cirino reported continued wrist pain and that she had red marks on her wrist and forearm where it had fractured.  (*Id.* at 1960.)  Cirino told Kelly she had been doing her own therapy at home.  (*Id.*)  Cirino also complained of numbness and tingling in her right hand.  (*Id.*)  Cirino rated her pain as a 4/10 that day.  (*Id.*)  Cirino also reported weakness in her hand.  (*Id.* at 1961.)  On examination, Kelly found S-L ligament tenderness on the right.  (*Id.* at 1965.)  Kelly ordered an MRI to evaluate whether there was any soft tissue injury.  (*Id.*)

On June 13, 2022, Cirino saw Cathy Dobrowski, APRN-CNP, for follow up regarding her headaches.  (*Id.* at 2373.)  Her last visit was in March of 2021.  (*Id.*)  Cirino reported she had "bad reactions to medications," was uncomfortable with starting Botox, and had not received Nurtec.  (*Id.* at 2374.)  Cirino told Dobrowski she took oxycodone four times a day, which reduced her pain from an 8/10 to a 4/10.  (*Id.*)  She experienced severe headaches daily that worsened with triggers and when the oxycodone wore off.  (*Id.*)  Laying down worsened her headaches.  (*Id.*)  Cirino described the pain as

11

squeezing and it was located on the right in the retro-orbital and temporal regions.  (*Id.*)  Associated symptoms included nausea and ptosis.  (*Id.*)  Her headaches ranged in severity from a 4-9/10.  (*Id.*)  She had zero headache-free days a month.  (*Id.*)  Her headache triggers included video display/TV, stress, and driving.  (*Id.*)  Dobrowski diagnosed Cirino with chronic migraine headache and noted they would get a precertification for an oral calcitonin gene-related peptide receptor antagonist Rimegepant to treat Cirino's chronic migraine.  (*Id.* at 2379.)  Dobrowski noted Cirino had 30 headaches per month that lasted more than four hours a day and that were associated with nausea and ptosis and worse with movement for three or more months.  (*Id.* at 2380.)  Dobrowski further noted Cirino had failed the following treatments: eletriptan, naratriptan, rizatriptan, sumatriptan, floricet, diclofenac, Vicodin/norco, hydromorphone, indomethacin, ketorolac, meloxicam, methadone, morphine, Tylenol #3, and tapentadol.  (*Id.*)  Dobrowski discussed lifestyle modification, treatment options, natural supplements, and infusion therapy.  (*Id.*)  Dobrowski also discussed medication overuse headache and instructed Cirino to limit use of acute treatments to no more than two days a week or 10 days a month.  (*Id.*)

On June 24, 2022, Cirino underwent a six-minute walk test.  (*Id.* at 2341.)  Deena Khabbaza, M.D., noted Cirino completed the test with no stops and with room air.  (*Id.*)  Dr. Khabbaza found the distance Cirino walked during the test to be moderately reduced.  (*Id.*)  Cirino rated her dyspnea during the test as a "5-Severe on the modified Borg scale" and her fatigue as a "7-Very severe on the modified Borg scale." (*Id.*)

On June 29, 2022, Cirino underwent an initial evaluation for pulmonary rehabilitation.  (*Id.* at 2237-44.)  Margaret Leneghan, exercise physiologist, found Cirino to be an appropriate candidate for pulmonary rehabilitation.  (*Id.* at 2244.)

On August 2, 2022, Cirino saw Lynn Ambrogi, RN, for her sixth pulmonary rehabilitation session. (*Id.* at 2756, 2760.)  Ambrogi noted Cirino would be missing a few sessions to have her swollen right

ankle evaluated and treated.  (*Id.* at 2756.)  At Cirino's last session, her SpO2 was 90% on room air while exercising, with a perceived dyspnea of 2/10.  (*Id.*)  Cirino "exceeded her goal of exercise minutes per session by 12 minutes."  (*Id.*)  Ambrogi noted Cirino continued to smoke a few cigarettes a day and was not interested in smoking cessation classes.  (*Id.*)  Cirino reported difficulty sleeping, feeling fatigued most days, experiencing bone pain and generalized pain, and experiencing neuropathy in her hands, arms, and legs.  (*Id.*)  Cirino cut the grass and did yard work.  (*Id.*)  She was also doing TheraBand exercises at home.  (*Id.*)

A chest CT taken on August 19, 2022 revealed post-radiation pneumonitis/changes in the left lung. (*Id.* at 2692-93.)

An MRI of the ankle taken that same day revealed a longitudinal split tear of the peroneus brevis tendon and associated peroneal tenosynovitis.  (*Id.* at 2704-05.)

On August 22, 2022, Cirino saw Erin Bender, PA-C, for memory concerns.  (*Id.* at 2672-73.) Cirino reported short-term and long-term memory issues.  (*Id.* at 2673.)  She could not remember her kids growing up or what she wore the day before.  (*Id.*)  She used sticky notes to remember.  (*Id.*)  Cirino wanted cognitive testing done.  (*Id.*)  Bender directed Cirino to follow up with neurology for further evaluation of her memory concerns.  (*Id.* at 2677.)

On August 26, 2022, Merribeth Carpenter, RN, BSN, messaged Cirino to inform her that her EMG was normal, and therefore "there [was] no evidence of large fiber neuropathy."  (*Id.* at 2838.)  As a result, "Dr. Merriman has no basis medically at this time for your disability claim, as there is no diagnostic support for completing the paperwork for disability."  (*Id.*)  However, Dr. Merriman had ordered a skin biopsy and QSART to test for small fiber neuropathy; if positive, Dr. Merriman could complete paperwork for a diagnosis of small fiber neuropathy.  (*Id.*)

13

**C.      State Agency Reports**

On September 2, 2021, Gary Hinzman, M.D., reviewed the file and opined Cirino could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 76, 78.)  Her ability to push and/or pull was limited beyond lift and/or carry.  (*Id.* at 76.)  She could occasionally climb ramps/stairs but never climb ladders, ropes, or scaffolds.  (*Id.* at 77.)  She could occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.*)  She could frequently perform fine and gross manipulation.  (*Id.*)  She must avoid concentrated exposure to extreme temperatures, humidity, vibration, and fumes, odors, dusts, gases, poor ventilation, etc.  (*Id.*)  She must avoid all exposure to hazards.  (*Id.*)

On March 19, 2022, on reconsideration, James Cacchillo, M.D., affirmed Dr. Hinzman's findings.  (*Id.* at 96-98.)

**D.      Hearing Testimony**

During the September 1, 2022 hearing, Cirino testified to the following:

- She lives with her husband and her two daughters.  (*Id.* at 47.)  Her daughters are 21 and 17. (*Id.*)

- She has a driver's license.  (*Id.* at 48.)  She can drive, although she does not drive often. (*Id.*)

- She stopped working when she was laid off for being unable to work while she had cancer.  (*Id.* at 49.)

- On a typical day, she wakes up because of her pain.  (*Id.*)  She takes her pain medication and lays back down while she waits for her medication to start working. (*Id.*)  If she is having a good day and her pain is manageable, she will try to do some housework, like dusting, folding some clothes, and picking up around the house.  (*Id.* at 49-50.)  If she is having a bad day, she is either on the couch or in bed for the day. (*Id.* at 50.)  When she does chores, she has to stop a lot because her hands start to hurt and go numb.  (*Id.* at 54.)  Her hands usually swell a few hours later.  (*Id.*)  She has dropped plates, glasses, a gallon of milk, pop bottles, etc.  (*Id.* at 55.)  When she is in bed all day, her pain is more intense, sharper, and more consistent.  (*Id.* at 56.)  It feels like burning and stabbing.  (*Id.*)  She will get bone pain in her leg that throbs and shakes her whole body.  (*Id.*)  Her headache gets so bad she wants to hit her head against the wall.  (*Id.*)  She has bad days three to four days a week.  (*Id.*)

- She no longer has any hobbies.  (*Id.* at 50.)  Her children bring the laundry over to her so she can fold it.  (*Id.*)  She rarely puts laundry in the washer and moves it to the dryer.  (*Id.*)  She does not cook because she forgets she has something on the stove.  (*Id.* at 53.)  Her mom will stop by to visit her.  (*Id.*)  She goes grocery shopping when one of her children can go with her.  (*Id.*)  She is afraid to go alone in case she has an asthma attack or falls.  (*Id.* at 54.)

- She cannot work because her hands go numb and hurt constantly.  (*Id.* at 52.)  She has bone pain from her hips to her toes.  (*Id.*)  She has memory issues.  (*Id.*)  She has headaches that never go away.  (*Id.*)  She has COPD and asthma, and she gets short of breath walking to another room or getting dressed and undressed.  (*Id.*)  She has trouble concentrating and focusing.  (*Id.*)  She does not have a colon and needs to be near a bathroom.  (*Id.*)  She hurts from head to toe and feels like she is constantly being stabbed with a hot poker.  (*Id.*)

- Her headaches started in 2002.  (*Id.*)  She has hemicrania continua, which is a constant headache that never ends.  (*Id.*)  Her headache intensifies several times during the day.  (*Id.*)  She sees pain management for her headaches, but there is no real treatment for what she has.  (*Id.*)

- She uses Symbicort and an inhaler for her COPD and asthma.  (*Id.*)  She was in lung therapy, but she injured her ankle and had to put it on hold.  (*Id.* at 53.)  She fell and tore a ligament in her ankle.  (*Id.*)  She falls a lot because her legs don't have the strength anymore.  (*Id.*)  She broke her wrist after falling at the beginning of the year.  (*Id.*)

- The only thing she can do for her hands is apply a topical pain medicine to them.  (*Id.*)  She just restarted Lyrica to see if it will work this time.  (*Id.*)

- She has a hard time tying clothes or shoelaces.  (*Id.* at 55.)  She has a hard time getting dressed because she gets short of breath easily and has an issue with buttons.  (*Id.*)  She does not shower unless someone is home with her.  (*Id.*)  She can wash her hair herself.  (*Id.*)

- Her pain causes sleep problems.  (*Id.* at 56.)  She is tired no matter what.  (*Id.*)

- She has neuropathy in her legs and in her feet.  (*Id.* at 57.)  Her feet hurt if she is on them too much.  (*Id.*)  Even if she is not on them too much, they ache.  (*Id.*)  She could not stand and/or walk or be on her feet for about six hours in a typical eight-hour workday because she has to lay down periodically to give her legs a rest.  (*Id.*)  She has to elevate her legs.  (*Id.*)

- She is short of breath all the time.  (*Id.* at 58.)

- She cannot stay focused.  (*Id.* at 59.)  When she tries to think of something, it causes her to get a severe headache, or she can't focus and loses her train of thought.  (*Id.*)  She has a hard time following instruction.  (*Id.*)  She has short-term and long-term memory problems.  (*Id.* at 60.)

The VE testified Cirino had past work as an assembly manager.  (*Id.* at 62.)  The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical individual of the claimant's age and education and with the past jobs that you described.  Further assume that this individual is limited as follows.  This would be a light exertional hypothetical with the following additional limitations: this individual can frequently handle and finger bilaterally.  Handle, finger, and let's see, I'm sorry, handle, finger, and feel bilaterally.  This individual can only occasionally climb ramps and stairs.  Never climb ladders, ropes, or scaffolds.  Can occasionally balance, stoop, kneel, crouch, and crawl.  This individual can never work at unprotected heights, or near dangerous moving machinery.  Cannot engage in commercial driving.  Can tolerate no more than frequent exposure to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, and vibration.  Can this hypothetical individual perform the past work that Ms. Cirino performed?

(*Id.* at 63.)

The VE testified the hypothetical individual would not be able to perform Cirino's past work as an assembly manager.  (*Id.* at 63.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as ticket taker, storage facility clerk, and furniture rental clerk.  (*Id.* at 64.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).    Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Cirino was insured on her alleged disability onset date, October 18, 2019, and remains insured through December 31, 2024, her date last insured ("DLI").  (Tr. 26.) Therefore, in order to be entitled to POD and DIB, Cirino must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement

17

to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.   The claimant has not engaged in substantial gainful activity since October 18, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: fibromyalgia; migraines; breast cancer status post lumpectomy, chemotherapy, and radiation; peripheral neuropathy; chronic obstructive pulmonary disease (COPD); and spine disorders (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: she can frequently handle, finger, and feel bilaterally; she can only occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl; she can never work at unprotected heights or near dangerous moving machinery; she cannot engage in commercial driving; and she can tolerate no more than frequent exposure to humidity and wetness, dusts, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, and vibration.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on August **, 1970 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 18, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 28-34.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)

19

("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In her first assignment of error, Cirino argues the ALJ committed harmful error when he failed to support his Step Three findings.  (Doc. No. 7 at 10.)  Cirino asserts the ALJ's "brief analysis" at Step

Three failed to state which, if any, listings were considered.  (*Id.* at 11.)  Such error was not harmless, as the ALJ failed to provide sufficient factual findings elsewhere in the opinion to support his Step Three determination.  (*Id.*)  Cirino asserts that the ALJ "condensed" over 2600 pages of medical records "into one page of analysis" and "devoted one paragraph each to Plaintiff's migraine headaches, asthma/COPD, and breast cancer."  (*Id.*)  The ALJ discussed Cirino's fibromyalgia, peripheral neuropathy, and spinal issues in conjunction with the discussion of Cirino's breast cancer.  (*Id.*)  Cirino argues the ALJ "erred in failing to consider the medical evidence documenting [her] symptoms related to her severe impairments, especially fibromyalgia, necessitating a remand in this matter."  (*Id.* at 12.)  In addition, the ALJ "failed to consider any symptoms related to these problems" in formulating the RFC.  (*Id.* at 14.)

In her second assignment of error, Cirino argues that the ALJ further erred at Step Three when he failed to properly evaluate her headaches.  (*Id.* at 15.)  Cirino asserts "the ALJ failed to even mention Ruling 19-4p" regarding her headaches.  (*Id.*)  In addition, the ALJ "failed to discuss the frequency of the migraines and/or cluster headaches in conjunction with Listing 11.02B."  (*Id.* at 17.)  Therefore, Cirino argues the ALJ erred in failing to find that she equaled Listing 11.02B based on her headaches pursuant to SSR 19-4p.  (*Id.*)  The ALJ further erred in failing to discuss the impact of Cirino's headaches on her ability to engage in substantial gainful activity on a full-time and sustained basis.  (*Id.* at 17-18.)

The Commissioner responds that the substantial evidence supports the ALJ's Step Three findings.  (Doc. No. 9 at 7.)  The Commissioner argues that the ALJ's "discussion of the clinical findings and objective studies was sufficient to support his step three determination that Plaintiff was not presumptively disabled under the criteria of any of the listed impairments."  (*Id.* at 9.)  The Commissioner notes that Cirino fails to identify which listings she meets, in addition to failing to present evidence showing she meets them.  (*Id.*)  The Commissioner asserts that Cirino fails to meet the burden of showing she meets or medically equals listing 11.02 because of her migraine headaches.  (*Id.* at 10.)  The Commissioner argues

21

that the ALJ was not required to specifically address Listing 11.02, and that the ALJ's statement that Cirino did not "'have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments' was sufficient articulation of his findings." (*Id.*) In addition, the ALJ found Cirino's subjective complaints regarding her headaches inconsistent with the overall record evidence. (*Id.* at 12.) The Commissioner maintains that "the ALJ adequately considered Plaintiff's migraine headaches throughout the sequential evaluation process and accounted for her migraine-related limitations to the extent such limitations were supported by the record evidence." (*Id.*)

In reply, Cirino asserts that the Commissioner's argument that she failed to meet her burden of showing medical equivalence as required by SSR 17-2 is contrary to the criteria of SSR 19-4p. (Doc. No. 10 at 1.) Cirino argues that SSR 19-4p "does not require a finding of equivalence"; instead, "the Ruling requires that the records contain a description of a headache by an acceptable medical source." (*Id.*) In this case, there were statements from acceptable medical sources describing Cirino's headaches, and therefore Cirino presented evidence showing medical equivalence to Listing 11.02B. (*Id.* at 1-2.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that her

impairments meet or are medically equivalent to a listed impairment.  *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision.  *Id.* at 416-17.

Regarding fibromyalgia, it "is not a listed impairment and it cannot meet a listing."  *Rodway v. Comm'r of Soc. Sec.*, Case No. 1:18CV0169, 2019 WL 540871, at *6 (N.D. Ohio Jan. 24, 2019) (collecting cases), *report and recommendation adopted by* 2019 WL 527782 (N.D. Ohio Feb. 11, 2019).  "Because fibromyalgia cannot meet a listing at Step Three, the ALJ must determine whether claimant's fibromyalgia medically equals a listing, such as Listing 14.09D for inflammatory arthritis, or whether it combines with at least one other medically determinable impairment to medically equal a listing."  *Id.* at *7 (citing *Kado v. Colvin*, Case No. 1:15-cv-02044-DAP, 2016 WL 6067779 (N.D. Ohio Oct. 17, 2016); *Walker v. Colvin*, Case No. 1:15-CV-1234, 2015 WL 13217098 (N.D. Ohio Dec. 11, 2015)).

Primary headache disorders are not included in the listed impairments. However, a listing is medically equaled if "a primary headache disorder, alone or in combination with other impairment(s),

23

medically equals a listing." SSR 19-4p, 2019 WL 4169635, at *7. The SSR instructs that Listing 11.02 (paragraph B or D for dyscognitive seizures) is the "most closely analogous listed impairment" for a medically determinable impairment of a primary headache disorder. In pertinent part, Listing 11.02B involves "Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)." 20 C.F.R. Part 404, Subpart P, App.1, § 11.02. In determining whether a claimant's impairments are equivalent to Listing 11.02B, the ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

Here, at Step Two, the ALJ determined Cirino suffered from the severe impairment of fibromyalgia and migraines. (Tr. 28.) At Step Three, the ALJ determined Cirino's impairments did not meet or medically equal the requirements of a Listing. (*Id.* at 30.) The entirety of the ALJ's Step Three analysis is as follows:

> No treating physician or examining physician has indicated diagnostic findings that would satisfy any listed impairment. After independently considering the listings, I find that the claimant's impairments, either separately or in combination, do not meet or medically equal the criteria of any listed impairment. The listings have threshold requirements that are not met in the instant case.

(*Id.* at 30.)

The Court finds the ALJ erred in failing to properly consider Cirino's fibromyalgia and migraine headaches at Step Three. Nowhere in the Step Three analysis did the ALJ mention Cirino's fibromyalgia and migraines and discuss whether they met or medically equaled a listing or combined with at least one other medically determinable impairment to medically equal a listing. Nor does the ALJ explain, at Step Three or elsewhere in the opinion, the broad and vague statement that "[t]he Listings have threshold requirements that are not met in the instant case." (*Id.*) "Even after considering the full decision, the court finds no analysis setting forth a medical equivalency determination for fibromyalgia," *Rodway*, 2019 WL 540871, at *8, or for migraine headaches.

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White*, 572 F.3d at 281; *Bowen*, 478 F.3d at 746 ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). This court has found that "failure to evaluate a requisite listing is not 'merely a formalistic matter of procedure,'" and that remand is required. *Standen v. Colvin*, Case No. 1:15-CV-482, 2016 WL 915254, at *4 (N.D. Ohio Mar. 7, 2016) (quoting *Reynolds*, 424 F. App'x at 416). The court found this to be so, even in a case where it was not immediately apparent that claimant would meet the listing. *Id.*

The ALJ further compounded the errors at Step Three with additional errors in the RFC analysis regarding Cirino's fibromyalgia and migraines. The ALJ emphasized normal examination findings in discussing Cirino's fibromyalgia. (Tr. 31-32.) It is clear, however, that the lack of "objective" medical evidence is not unusual, but rather the norm in fibromyalgia cases. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007) (noting that CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity"); *Preston v. Sec'y of Health & Human Svcs.*, 854

F.2d 815, 817-818 (6th Cir. 1988) (stating that "[t]here are no objective tests which can conclusively confirm" fibromyalgia); *Keating v. Comm'r of Soc. Sec.*, No. 3:13-CV-487, 2014 WL 1238611, at *6 (N.D. Ohio March 25, 2014) ("This circuit has recognized that symptoms of fibromyalgia are often not supportable by objective medical evidence"); *Schlote v. Astrue*, No. 1:11-cv-01735, 2012 WL 1965765, at *6 (N.D. Ohio May 31, 2012).  Similarly, the fact that physical examinations often yielded normal findings is not necessarily inconsistent with fibromyalgia.  Indeed, the Sixth Circuit has repeatedly and consistently recognized that fibromyalgia patients typically "manifest normal muscle strength and neurological reactions and have a full range of motion."  *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861-862 (6th Cir. 2011) (citing *Preston*, 854 F.2d at 820).  *See also Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 434 (6th Cir. 2013) (noting fibromyalgia claimants "demonstrate normal muscle strength and neurological reactions and can have a full range of motion"); *Keating*, 2014 WL 1238611, at *6.

In addition, while the ALJ found Cirino's medication was "reducing her headaches and pain to an acceptable level to allow her to remain functional" (Tr. 31), the ALJ failed to mention contrary lines of evidence in the record, including a notation from Dr. Lagman that Cirino's medication for her headaches was helping her headaches but not her muscle and joint pain (*id.* at 505) and a notation from Dr. Merriman that her bone pain was constant, nothing helped it, and walking made it worse (*id.* at 1974).

Regarding Cirino's headaches, the ALJ failed to discuss the March 10, 2021 appointment Cirino had with Dr. Baron for evaluation of her headaches.  (*Id.* at 30-32.)  Dr. Baron noted Cirino had 30 headaches per month lasting four or more hours and associated with photophobia, phonophobia, and nausea.  (*Id.* at 1535.)  Dr. Baron opined that Cirino's disability was high.  (*Id.*)  Cirino had tried and failed a large number of medications, including analgesics, anti-anxiety, anti-convulsant, anti-depression/anti-psychotic, antiemetics, anti-migraine, blood pressure medication, muscle relaxers, sleep

aids, supplements, over the counter medications, and other medications.  (*Id.* at 1536-37.)  Nor did the ALJ discuss the June 13, 2022, visit Cirino had with APRN-CNP Dobrowski for follow up regarding her headaches.  (*Id.* at 30-32.)  Cirino experienced severe headaches daily that worsened with triggers and when the oxycodone wore off.  (*Id.* at 2374.)  Her headaches ranged in severity from a 4-9/10.  (*Id.*)  She had zero headache-free days a month.  (*Id.*)  Her headache triggers included video display/TV, stress, and driving.  (*Id.*)  Dobrowski noted Cirino had 30 headaches per month that lasted more than four hours a day and that were associated with nausea and ptosis and worse with movement for three or more months.  (*Id.* at 2380.)  Dobrowski further noted Cirino had failed the following treatments: eletriptan, naratriptan, rizatriptan, sumatriptan, floricet, diclofenac, Vicodin/norco, hydromorphone, indomethacin, ketorolac, meloxicam, methadone, morphine, Tylenol #3, and tapentadol.  (*Id.*)

Courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis*); Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.' "); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13,

27

2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

This Court having found that such circumstances warrant remand, the undersigned recommends the Commissioner's decision be vacated and remanded for proper consideration of Cirino's fibromyalgia and migraines at Step Three.

As the undersigned recommends remand on this issue, in the interest of judicial economy, the undersigned will not address Cirino's additional assignments of error.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: March 22, 2024                               *s/ Jonathan Greenberg*
                                                    Jonathan D. Greenberg
                                                    United States Magistrate Judge

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**